**NO ORAL ARGUMENT SCHEDULED**

**CASE NO. 13-7071**

---

**UNITED STATES COURT OF APPEALS
DISTRICT OF COLUMBIA CIRCUIT**

---

**UNITED STATES EX REL. JOHN DOE
Plaintiff-Appellant**

v.

**STAPLES, INC., OFFICE MAX, INCORPORATED, TARGET, CORP.,
AND INDUSTRIES FOR THE BLIND, INC.**

**Defendants-Appellees**

---

**On Appeal from the United States District Court
For the District of Columbia
Case No. 08-846 (RJL)**

---

# APPELLANT'S PRINCIPAL BRIEF

---

Joseph A. Black (D.C. Bar 414869)
Joyce E. Mayers (D.C. Bar 268227)
James A. Moody (D.C. Bar 294594)
Of Counsel
The Cullen Law Firm, PLLC
1101 30th Street NW, Suite 300
Washington, DC 20007
(202) 944-8600

September 12, 2013                                    *Counsel for Appellant*

# <u>CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES</u>

As required by D.C. Circuit Rule 28(a)(1) Appellant submits the following:

# <u>CERTIFICATE OF THE PARTIES</u>

The parties appearing thus far in this proceeding are:

**Appellant:**          **John Doe**
                        c/o Joseph A. Black
                        Joyce E. Mayers
                        James A. Moody
                        The Cullen Law Firm, PLLC
                        1101 30th Street, NW, Suite 300
                        Washington, D.C. 20007

**Appellees:**          **Staples, Inc.**
                        500 Staples Drive
                        Framingham, MA 01702
                        c/o David William Ogden
                        Don Bradford Hardin , Jr.
                        WILMER CUTLER PICKERING HALE & DORR LLP
                        1875 Pennsylvania Avenue, NW
                        Washington, DC 20006

                        **OfficeMax Incorporated**
                        263 Shuman Blvd
                        Naperville, IL 60563
                        c/o John F. Henault , Jr.
                        Paul Graves
                        PERKINS COIE LLP
                        700 13th Street, NW
                        Washington, DC 20005

                        Steve Y. Koh
                        PERKINS COIE LLP
                        1201 Third Avenue, Suite 4900
                        Seattle, WA 98101

**Target Corporation**
1000 Nicollet Mall
Minneapolis, MN 55403
c/o John M. Peterson
Maria E. Celis
Richard F. O'Neill
NEVILLE PETERSON, LLP
17 State Street, Suite 1900
New York, NY 10004

James L. Volling
Matthew Kilby
FAEGRE BAKER DANIELS LLP
2200 South Seventh Street
Minneapolis, MN 55402

**Industries for the Blind, Inc.**
445 S. Curtis Rd.
West Allis, WI 53214
c/o Leslie Paul Machado
Robert P. Fletcher
LECLAIR RYAN
1101 Connecticut Ave, NW
Suite 600
Washington, DC 20036

## RULINGS UNDER REVIEW

Docket 80, Opinion by Judge Richard J. Leon filed March 25, 2013. JA 184.

## RELATED CASES

No related cases.

## <u>CORPORATE DISCLOSURE PURSUANT TO D.C. CIR. RULE 26.1</u>

Appellant, Relator John Doe is an individual.

# <u>TABLE OF CONTENTS</u>

CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES ...............i

CORPORATE DISCLOSURE PURSUANT TO D.C. CIR. RULE 26.1............... iii

TABLE OF CONTENTS.........................................................................iv

TABLE OF AUTHORITIES ...................................................................vi

JURISDICTIONAL STATEMENT ..........................................................1

STATEMENT OF ISSUES ....................................................................1

    A. Nature of the Action .................................................................1

    B. Issues Presented ....................................................................2

STATEMENT OF THE CASE.................................................................3

STATEMENT OF THE FACTS ..............................................................6

SUMMARY OF THE ARGUMENT ........................................................10

ARGUMENT ......................................................................................15

  I.    STANDARD OF REVIEW ...........................................................15

  II.   RELATOR'S CLAIMS ARE NOT BARRED AS A PUBLIC
       DISCLOSURE..........................................................................15

        A.    There Has Been No Public Disclosure of Any Allegation or
              Transaction of Defendants' Fraud So that Relator's Claims Are
              Not Barred ...................................................................15

            1.    The ITC Reports do not Represent a Public Disclosure ........20

2.    The ITC Reports' Description of the Characteristics of Chinese Pencils is Incomplete and Based on Dated and Conflicting Opinions of Industry Representatives.................21

3.    There has been no "Public Disclosure" of the Characteristics of  Defendants' Pencils..................................30

B.    The Relator Qualifies as an Original Source of the Information Regarding the Characteristics of Chinese-Made Pencils..............32

CONCLUSION .........................................................................................34

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Del Monte Fresh Produce Company v. United States,*
  570 F.3d 316  (D.C. Cir. 2009) ...........................................................15

*\*Graham County Soil and Water Conservation Dist. v. United States ex rel.*
  *Wilson*, 559 U.S. 280 (2010)) ..................................................... 14, 30

*Little v. Shell Exploration & Prod. Co.*,
  690 F.3d 282 (5th Cir. 2012)...................................................21

*Munsell v. Department of Agriculture,*
  509 F.3d 572 (D.C. Cir. 2007) ...............................................15

*Nat'l Taxpayers Union, Inc. v. United States*,
  68 F.3d 1428 (D.C.Cir.1995) ...............................................15

*Rockwell International Corp. v. United States,*
  549 U.S. 457 (2007).............................................................34

*Schindler Elevator Corp. v. United States ex rel. Kirk,*
  131 S.Ct. 1885 (2011) .................................................... 14, 19

*U.S ex rel. Digital Healthcare, Inc. v. Affiliated Computer Services, Inc.*,
  778 F. Supp. 2d 37 (D.D.C. 2011) ................................... 17, 21

*United States ex rel. Baltazar v. Warden*,
  635 F.3d 866 (7th Cir.2011)....................................................21

*\*United States ex rel. Davis v. Dist. of Columbia,*
  678 F.3d 832 (D.C. Cir. 2012) ..................................... 5, 17, 32

*United States ex rel. Findley v. FPC-Boron Employees' Club,*
  105 F.3d 675 (D.C. Cir. 1997) ...............................................17

*\*United States ex rel. Springfield Terminal Railway Co. v. Quinn,*
  14 F.3d 465 (DC Cir. 1994) ........................................... 11, 17

*United States. v. Golden Ship Trading Co.,*
   25 C.I.T 40 (2001)..................................................................................11

**Statutes**

19 U.S.C. § 1592(c)(4) .............................................................................7

28 U.S.C. § 1291 .......................................................................................1

28 U.S.C. § 1345 .......................................................................................1

31 U.S.C. § 3729(a)(7) ..............................................................................3

31 U.S.C. § 3729–3733 .............................................................................1

31 U.S.C. § 3730(a)(7) ..............................................................................2

31 U.S.C. § 3730(b) ............................................................................ 12, 29

31 U.S.C. § 3730(e)(4) .........................................................................4, 16

31 U.S.C § 3730(e)(4)(A) ................................................................ 11, 19, 30

31 U.S.C. § 3731(e)(4)(B) ........................................................................5

31 U.S.C. § 3732(a) ..................................................................................1

**Regulations**

19 C.F.R Part 102........................................................................................7

**Administrative Material**

*Certain Cased Pencils from the People's Republic of China,*
   58 Fed. Reg. 64548, (Dep't of Commerce Dec. 8, 1993) (initiation)....................6

*Certain Cased Pencils from the People's Republic of China,*
   59 Fed. Reg. 66909 (Dep't of Commerce Dec. 28, 1994) ......................................6

*Certain Cased Pencils from the People's Republic of China*,
  68 Fed. Reg. 43082 (Dep't of Commerce July 21, 2003) (final admin. review)....6

*Certain Cased Pencils from Thailand,*
 Inv. Nos. 731-TA-670, USITC Pub. 2816 (Oct. 1994) (Final). ............ 9, 22, 23, 24

*Certain Cased Pencils from China,*
  Inv. No. 731-TA-669, USITC Pub. 3820 (Nov. 2005)
  (Second Review). .................................................................. 9, 10, 22, 24, 25, 29

## **Rules**

Fed. R. Civ. Rules 8(a)(2) ............................................................................4

Fed. R. Civ. Rule (9)(b) ........................................................................4, 12

Fed. R. Civ. 12(b)(6) ...................................................................................4

*\*Authorities upon which we chiefly reply on are marked with an asterisks*

## JURISDICTIONAL STATEMENT

This is a civil action brought under the False Claims Act, 31 U.S.C. §§ 3729–3733 ("FCA") by Appellant John Doe, acting for himself and on behalf of the United States, against Defendants Staples Inc., OfficeMax Incorporated, Target Corp, and Industries for the Blind, Inc.  The district court had subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1345 and 31 U.S.C. § 3732(a).  This Court has appellate jurisdiction under 28 U.S.C. § 1291.  This is an appeal from a final judgment of the district court entered on March 25, 2013 (Dkt. No. 81) Joint Appendix ("JA" ), JA 196 -- incorporating the opinion entered on March 25, 2013 (Dkt. No. 80), JA 184.  The Notice of Appeal was timely filed on April 22, 2013 (Dkt. No. 82.), JA 198.

## STATEMENT OF ISSUES

### A.      Nature of the Action

This appeal involves the proper application of the "public disclosure " jurisdictional bar of the FCA.  Plaintiff/Relator Doe filed this FCA action alleging that the Defendants avoided the payment of antidumping duties imposed on imports of Chinese-made pencils by transshipping those pencils through third countries.  The Relator based his allegations on an investigation he undertook of pencil exporters in Indonesia, Taiwan, and Vietnam who were identified in trade data as selling pencils to the Defendants.  Through this investigation the Relator

learned non-public information that all of the suppliers identified in the complaint either did not produce or were not capable of producing the pencils they were shipping to the United States.  The Relator further alleged that – based on the price and physical condition of the pencils – the importers knowingly falsely declared the origin of their pencils, which resembled low-end Chinese-made pencils.  The false statements regarding country of origin on Customs entry documents, CBP Form 7501, are actionable under § 3730(a)(7).  The district court dismissed the complaint because it found that there had been a "public disclosure" of the characteristics of Chinese pencils in two U.S. International Trade Commission ("ITC") reports related to the imposition of the antidumping duties and that Relator did not qualify under the "original source" exception .

## B.    Issues Presented

1.     The "public disclosure" bar applies to the disclosure of fraudulent "allegations or transactions."  The discussion of the quality of Chinese-made pencils in the ITC reports does not identify any of the allegations or transactions at issue in the Complaint nor any specific importers or transactions, nor does it suggest that low quality pencils are not produced in other countries.  Under these circumstances, do the ITC reports represent a "public disclosure of allegations or transactions" of the fraud that bars Relator's complaint?

2

2.      A "public disclosure"  under the FCA is limited to information disclosed only in specific channels set forth by Congress:  "a criminal, civil, or administrative hearing . . . a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media."  Does the physical appearance of pencils on the Defendants' retail shelves represent a "public disclosure?"

3.      The "original source" exception to the jurisdictional bar permits a Relator to proceed who has "direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action."   Is the Relator an "original source" where the record demonstrates that he is an industry insider and possesses direct and independent knowledge of the characteristics and prices of Chinese-made pencils and provided that information to the Government before he filed his complaint?

## **STATEMENT OF THE CASE**

On May 15, 2008, Relator John Doe filed a complaint under the FCA, 31 U.S.C. § 3729(a)(7)[1], alleging that Defendants Staples Inc., OfficeMax

---

[1] Since the complaint in this action was filed in 2008, it is largely governed by the statute as it existed at that time, prior to the amendments of the FCA that occurred in 2009 and 2010.  Therefore, this brief will refer to the pre-amendment provisions. However, since this case was only unsealed in March 2012 and the Defendants continued making false claims to Customs during the pendency of the seal, those later claims would be governed by the amendments.  If applied, Relator does not

Incorporated, Target Corp, and Industries for the Blind, Inc. ("IFTB") submitted false claims regarding the country of origin of Chinese-made pencils to U.S. Customs and Border Protection ("Customs") to avoid paying a 114.9 percent antidumping duty on those pencils.   The complaint further alleged that the Defendants falsely marked the origin of those pencils, which subjected them to a 10 percent marking duty.  The marking duty was also avoided by Defendants' false claims of origin.   On April 2, 2012, the Department of Justice filed a notice that the "United States has not made an intervention decision in this matter" and asked that the matter be unsealed so the Relator could pursue the action.  Dkt. No. 20. On May 03, 2012, the district court ordered that the complaint be unsealed.  Dkt. No. 21.   On May 21, 2012, the Relator filed his First Amended Complaint ("FAC"), Dkt. No. 22, which specified additional false claims that the Defendants had made since the original complaint had been filed.

Defendants each filed a motion to dismiss.  Dkt. Nos. 39, 52-1, 54-1, and 56. The Defendants made essentially three arguments before the district court for dismissing the FAC in its entirety: (1) the FAC does not state a cause of action under Rules 8(a)(2) and 12(b)(6); (2) the FAC does not plead fraud with particularity as required by Rule (9)(b); and (3) the court's jurisdiction is barred as a result of a public disclosure under 31 U.S.C. §3730(e)(4) for which the Relator

---

believe that those amendments would have a material effect on the outcome of this case.

was not an original source.   The district court did not address the first two issues; instead it only focused on public disclosure question and found for the Defendants. Dkt. No. 80, JA 184.  The district court dismissed Relator's complaint with prejudice for lack of subject matter jurisdiction. Dkt . No. 81, JA 196.  In doing so, the court erred by impermissibly expanding the public disclosure bar and assuming facts not supported by the record.

The district court also erroneously found that the Relator was not an original source of the information that the court found to be publicly disclosed.  While the Relator did not attempt to argue that he was an original source on which the allegations were based, he did request that he be given the opportunity to demonstrate that he qualified as an original source.  However, there was more than enough evidence in the record to demonstrate – under the standard announced in *United States ex rel. Davis v. Dist. of Columbia*, 678 F.3d 832 (D.C. Cir. 2012) – that he was an original source, because he has "direct and independent knowledge of the information on which the allegations [at issue] are based and has voluntarily provided the information to the Government before filing [this] action." 31 U.S.C. 3731(e)(4)(B).

## <u>STATEMENT OF FACTS</u>

On December 28, 1994, the Department of Commerce ("Commerce") issued an order imposing antidumping duties of 44.66 percent on cased pencils from China. *Certain Cased Pencils from the People's Republic of China*, 59 Fed. Reg. 66909 (Dep't of Commerce Dec. 28, 1994). This order was issued following extensive investigations by Commerce to establish the antidumping duty rate and the United States International Trade Commission ("ITC") to determine if an industry in the United States was injured by the dumping. The dumping investigation was initiated following a complaint from the U.S. pencil industry that domestic pencils producers were being injured by the importation of low-priced pencils produced in China. *Certain Cased Pencils from the People's Republic of China*, 58 Fed. Reg. 64548, (Dep't of Commerce Dec. 8, 1993)(initiation).

The order on pencils has been revised a number of times since 1994. As of July 21, 2003, the antidumping duty rate was 114.9 percent for all but a few Chinese pencils manufactures. *Certain Cased Pencils from the People's Republic of China*, 68 Fed. Reg. 43082 (Dep't of Commerce July 21, 2003) (final admin. review). Even though this high rate of duty should have given protection to U.S. pencil producers, members of the industry, including the Relator, began to notice that many of the large customers of pencils were purchasing unusually low priced pencils from suppliers in third countries located in the Far East. These customers

6

included the three retail Defendants named in the FAC.  Relator Doe Decl. ¶ 9, Ex.

A (Dkt. No. 47-1), JA 75.

The Relator hired agents to corroborate his belief that certain pencil

suppliers in Indonesia, Taiwan and Vietnam, who were selling pencils to the

Defendants,  either were not capable of producing or did not produce the pencils

they were shipping to the Defendants.[2]  *Id*. ¶ 11.  The Relator also relied on

industry sources within and outside those countries to obtain information about

Defendants' suppliers.  None of this information was "publicly disclosed" within

the meaning of the FCA.  Based on this non-public information, together with

publicly available trade data obtained from databases, the Relator then filed his

original complaint on May 15, 2008.  This filing was preceded by a meeting on

May 7, 2008, with officials from U.S. Immigration and Customs Enforcement

("ICE") and a formal letter where the Relator provided the information on which

the original complaint was based.  *Id*. ¶ 12.

After the Relator's disclosures to the government and during the pendency

of the four-year investigation by Customs and ICE, two of the Defendants made

"prior disclosures" pursuant to 19 U.S.C. § 1592(c)(4), which admitted many of

---

[2] As indicated in the FAC, some of these third-country suppliers did perform some
finishing operations on Chinese-made pencils.  However, under Customs Rules of
Origin such finishing does not change the country of origin of the pencils.  19
C.F.R. Part 102.

the allegations contained in the FAC.  One of these disclosures was filed by Target

by letters dated September 3 and October 5, 2009.  The other was filed by

OfficeMax by letters dated February 25 and May 25, 2011, following its receipt of

a November 12, 2010, summons from ICE requesting information regarding its

pencil importations.[3]   Relator obtained these disclosures from the government

under a confidentiality agreement with the government.   In these disclosures,

Target and OfficeMax admitted the essential allegations in the FAC and that they

had not paid required duties on at least some of the transactions alleged in the

FAC.

The source of the public disclosures claimed by the Defendants to set out the

characteristics of Chinese-made pencils were two ITC reports related to the

imposition of antidumping duties.  The full text of the relevant ITC report language

is:

> Five of the 7 responding U.S. producers and 7 of 24 responding
> importers reported that U.S.- produced pencils are of better quality
> than Chinese-produced pencils.  Two of the responding U.S.
> producers stated that Chinese pencils use lower quality wood, did not
> sharpen or erase well, had loose ferrules and erasers, and had leads
> that would break easily.  However, one U.S. producer indicated that
> the Chinese quality had been improving and that the price differential
> was more significant than and out weighted the quality differences
> between the U.S. and Chinese pencils.  One U.S. importer that uses
> Chinese pencils for *** agreed.

---

[3] The Relator filed these "prior disclosures" under seal with the district court to
demonstrate that his claims were meritorious and "plausible."  They have not been
included in the Appendix, because they are not relevant to the issues in this appeal.

ITC Pub. 2816 Certain Cased Pencils from Thailand, Investigation No. 731-TA-

670 (Final) at II-49 (Oct. 1994). JA 165.

> "17 [importing] firms reported that there were no significant
> differences in the quality of Chinese pencils . . . vis-a-vis domestic
> pencils."

ITC Pub. 2816 at II-49, n. 101.  JA 165.

> Purchasers were divided on the issue of product comparability
> between U.S. and imported pencils.  While about one half of
> responding purchasers (i.e. 7 of 16) reported that there were no
> significant differences between domestic and imported pencils, the
> remaining purchasers stated that there were.  Nine of 15 firms
> reported that the quality of the domestic product was superior to that
> of the pencils imported from China and Thailand.  Purchasers stated
> that U.S. pencils have a better finish, paint covering, centering of lead,
> and attachment of ferrule and eraser.

ITC Pub. 2816 at II-54, JA 166.

> The report for the original investigation indicated that the differences
> in appearance between U.S.-produced and imported cased pencils
> were not sufficiently great for the average retail customer to detect
> them. The imported pencils subject to the investigation, however,
> were made from lower quality, less expensive wood, eraser, ferrules,
> and cores than comparable U.S.-made articles.  In response to
> questionnaires issued during the original investigation, U.S. importers
> generally conceded that the Chinese-produced pencils they imported
> were of lower quality than domestically produced pencils.

ITC Pub. 3820 Cased Pencils from China,  Investigation No. 731-TA-669

(Second Review) at I-7 Nov. 2005).

> Low-end pencils in China are made from poplar, use lower quality
> graphite, and use the original color of the wood with no lacquer or use
> low-end paint.

9

ITC Pub. 3820 at I-19. JA 216.

## SUMMARY OF THE ARGUMENT

The FAC makes three separate allegations regarding each of the Defendants. The principal allegation is that all of the Defendants' suppliers either did not make or were incapable of making the pencils that they shipped to the United States.  In certain cases, the FAC makes specific allegations that the pencils are of Chinese origin; in other cases Chinese origin is inferred.  As explained in the FAC, these allegations were based on foreign trade data (which is not publicly available) or by visits to the factories and interviews by Relator's agents hired to investigate the factories' capabilities.  *See* FAC at ¶¶ 25-27, JA 11-12, 40, (Staples), JA 53; ¶¶ 42-48 (Target), JA 54-55; ¶51(IFTB); and ¶54 (OfficeMax), ), JA 56-57, Doe Declaration (Dkt No. 47-1), JA 75

The second set of allegations was the identification of specific shipments of pencils for which the defendants made false claims of origin.  These allegations were based on manifest information submitted to Customs by all shippers and compiled by organizations such as PIERS Global Intelligence Solutions ("PIERS").  FAC ¶ 22, JA 43.  The district court found that the PIERS data was publicly disclosed.  While the Relator does not agree with this finding, he does not contest this finding for the purpose of this appeal.

10

Together, these two sets of allegations combine to demonstrate that the Defendants purchased Chinese-made pencils from suppliers in third countries and fraudulently declared them to be of non-Chinese origin.  Under the formula established by this Court in *United States ex rel. Springfield Terminal Railway Co. v. Quinn*, 14 F.3d 465 (DC Cir. 1994), this is expressed as  $X + Y = Z$,  where Z represents the *allegation* of fraud and X and Y represent its essential elements.  *Id*. at 654.  In this case, there is no public disclosure of the fraud "Z."  For there to be a public disclosure of the transaction of fraud, both "X" and "Y" have to be publicly disclosed as described by § 3730(e)(4)(A).  Here, X represents the facts – based on the PIERS data – that those pencils were entered as coming from non-Chinese sources and Y represents the facts – based on Relator's non-public investigation – that the suppliers did not or do not have the capability of producing pencils.  Under this formula, since only X was arguably publicly disclosed, the statutory standard barring subject matter jurisdiction has not been met.  *Id.*

The third set of allegations contained in the FAC is that the Defendants "knowingly" made false claims to Customs regarding the origin of their pencil imports, because they were put on notice by the substandard quality and low prices of those pencils.  FAC ¶¶ 19-21, JA 41-43.  Under Custom law the importer has a duty to inquire as to the country of origin when certifying those facts on *Customs* entry documents.  *See United States. v. Golden Ship Trading Co.,* 25 C.I.T 40, 46-

11

8 (2001). The allegations of quality and price were included to meet the pleading requirements for scienter contained in Rule 9(b), which in this case means that the Defendants acted in reckless disregard of the origin of their pencil importations. 31 U.S.C. § 3730(b). Facts related to quality and price do not in themselves disclose the country of origin, but they put importers on notice that they must investigate before certifying. The district court ignored the purpose of these allegations, and concluded that this information was contained in a public disclosure. That disclosure was a discussion of the quality of the pencils that was contained in two reports issued by the ITC in 1994 and 2005.

Without additional intelligence, the quality of the pencils does not disclose that they originate in China. The fact that a pencil is of a substandard quality and similar to low-end Chinese pencils suggests only that those pencils may be of Chinese origin. It is possible that factories in Taiwan, Indonesia and Vietnam produce substandard pencils. Without the information – provided by the Relator, that the named factories could not and did not produce the pencils – no "transaction" or "allegation" of fraud is apparent. Those facts, the "Y" in the *Springfield Terminal* equation, were not public. Again, that crucial information was supplied by the Relator's investigation. It is simply impossible to allege fraud, or an FCA violation, without the private intelligence gathered exclusively by the Relator.

12

Further, apart from the question of whether the quality of Chinese pencils could, without more, represent the "Y" in the *Springfield Terminal* equation, the description in the ITC reports is incomplete and based on conflicting opinions, and therefore, cannot represent a public disclosure of allegations or transactions of fraud. The scope of the purported public disclosure is simply too general and non-specific to bar litigation of false claims made by specific importers with respect to specific pencils.

Moreover, there is another important element that is missing from the ITC reports for them to be a public disclosure. That is a description of the physical condition of pencils imported by the Defendants. Because of that omission, the ITC reports cannot represent a public disclosure. The district court acknowledged this by stating that information was available elsewhere. The court stated that "the characteristics of defendants' pencils are also publicly disclosed through print media, the internet, and their visibility on public store shelves." Slip op. at , JA 191.

This conclusion also represents a reversible factual and legal error. First, it is impossible to discern the quality of the pencils or even suggest that those pencils originate in China from the pictures in print and internet advertising. *See* Staples'

13

exhibits, Dkt. No. 56-1, JA 135, 56-2, JA 141. [4]  Moreover, that advertising does not state the country of origin of those pencils.  Therefore, it is not possible to determine whether the Defendants made a false claim of origin based on their print and internet advertizing.  Second the pencils "on public store shelves" do not represent a public disclosure under the statute.  *See Schindler Elevator Corp. v. United States ex rel. Kirk* 131 S.Ct. 1885, 1888 (2011) ("By its plain terms, the bar applies to some methods of public disclosure and not to others.") (*citing Graham County Soil and Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 285-86 (2010)).

The district court also found that the Relator could not be an original source of the publicly disclosed information.  The rationale for this decision was that the Relator gained his knowledge from "industry insiders, analyzing trade data, and "hiring investigators in Taiwan, Indonesia and Vietnam to investigate individual suppliers who were identified by sources within the industry.'"  Slip op. at 11, JA 194.  The court's error was that the information obtained from these sources was not publicly disclosed, i.e., that the suppliers were not capable of or did not make the subject pencils.  Therefore, the original source issue does not arise for this information.  However, the plaintiff was an original source for information

---

[4] Indeed, the quality of the pencils in those pictures looks quite good.  This could be the effect of Photo Shop; it would not be possible to make an allegation that those pencils are of Chinese origin based on those pictures.

regarding the quality of the pencils, which the court found to be publicly disclosed. The record shows that the Relator did have direct and independent knowledge of this information, because he was an industry insider and because the information he disclosed was far more extensive than the snippets of information contained in the ITC reports.  Therefore, if the Court determines that the ITC reports represent a public disclosure, the Relator qualifies as an original source of that information with direct and independent knowledge of the quality of Chinese pencils that he voluntarily submitted to the government prior to the filing of his complaint.

## ARGUMENT

## I.     STANDARD OF REVIEW

This court reviews de novo the District Court's dismissal of a complaint for lack of subject matter jurisdiction. *Munsell v. Department of Agriculture,* 509 F.3d 572, 578 (D.C. Cir. 2007); *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1432 (D.C.Cir.1995); *Del Monte Fresh Produce Company v. United States,* 570 F.3d 316, 321 (D.C. Cir. 2009).

## II.     RELATOR'S CLAIMS ARE NOT BARRED AS A PUBLIC DISCLOSURE.

### A.     There Has Been No Public Disclosure of Any Allegation or Transaction of Defendants' Fraud So that Relator's Claims Are Not Barred.

The district court found that there was a public disclosure of Defendants' false declarations of the origin of its Chinese-made pencils.  It based this finding

15

on the fact that the country of origin of importations from certain suppliers can be determined from publicly available manifest data and by the fact that the ITC stated in its reports that Chinese pencils are of low quality when compared with U.S.-produced pencils.  The district court concluded without analysis that the few statements regarding the quality of Chinese pencils was publicly disclosed and was a way of distinguishing Chinese pencils from other third country pencils.  The district court then minimized the key allegations in the FAC that Defendants' third country suppliers were not capable of manufacturing or did not manufacture the pencils purchased from those suppliers.

The public disclosure bar provides:

(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4).

 In this Circuit, the public disclosure bar is applied according to the rule from *Springfield Terminal*.  The FCA jurisdictional bar is triggered only when

16

there has been a public disclosure of "allegations or transactions" of fraud.  *United States ex rel. Findley v. FPC-Boron Employees' Club,* 105 F.3d 675, 686-87 (D.C. Cir. 1997) (reversed on other grounds, *Davis*, 678 F.3d at 838-39).  "The term 'allegation connotes a conclusory statement implying the existence of provable supporting facts.'  The term 'transaction suggests an exchange between two parties or things that reciprocally affect or influence one another.'"  *Id.* (*quoting Springfield Terminal*, 14 F.3d 645 at 653- 54).  "The District of Columbia Circuit explained the significance of the terms 'allegation' and 'transaction' with an algebraic equation:  X (the misrepresented facts) + Y (the true facts) = Z (the fraud)."  *United States ex rel. Digital Healthcare, Inc. v. Affiliated Computer Services, Inc.*, 778 F. Supp. 2d 37, 46 (D.D.C. 2011) (citing *Springfield Terminal*, 14 F.3d at 654.)   Qui tam actions are barred ***only*** when enough information exists in the public domain to expose ***the fraudulent transaction*** (the combination of X and Y) or the ***allegation of fraud*** (Z).  *Digital Healthcare, Inc.*, 778 F. Supp. 2d at 46.  This Court concluded: "[w]here only one element of the fraudulent transaction is in the public domain (*e.g.,* X), the *qui tam* plaintiff may mount a case by coming forward with either the additional elements necessary to state a case of fraud (*e.g.,* Y) *or* allegations of fraud itself (*e.g.,* Z)." *Springfield Terminal*, 14 F.3d at 655.  The manifest data reveals the name of the foreign supplier and its address, the specific shipments of pencils by the entity entering the goods into the

United States and the bill of lading number that identifies the specific Customs
entries where the false claims were made.  Thus, the manifest data provides the
name of foreign supplier and the country where the supplier is located, X. (FAC
¶23).  However, without more, it is not possible to prove that the claim, Z, is false.
That proof is provided by Relator's allegations, Y, that the suppliers do not
produce pencils or do not produce the pencils they sell to U.S. buyers.

 The allegations of the FAC fully satisfy the requirements of the equation set
as the standard in this Circuit to demonstrate that there has been no public
disclosure of the fraud.  First, the FAC provides the "Y" in the equation. Various
sellers of pencils in third countries do not produce pencils or do not produce all of
the pencils that they sell to the United States.  This information is *not* public.  The
principal way that this information was developed was by a paid investigation of
the foreign factory or through industry informants.[5]  Relator Doe Decl. ¶ 11, Ex. A
(Dkt. No. 47-1).  Examples of this type of allegation are contained in the FAC at ¶¶
25-30 (JA 44-46), ¶¶39-40 (JA 53), ¶¶42-45, (JA 54), ¶¶47-48 (JA 55), ¶51 (JA
56) and ¶¶ 53-54 (JA 57).

 Factor "X" consists of the specific examples of the Defendants' importations
where they made false claims that Chinese-made pencils were made in countries

---

[5] The Relator's efforts to confirm that the foreign suppliers did not produce the
subject pencils demonstrate that he is more than an "opportunistic" relator as
suggested by the district court.  Slip op. at 5 JA 188.

other than China.  These are contained at ¶¶ 32, 38, 41, 46, 49, 52, and ¶ 55. JA 46,

51, 53, 55, 56-57.  These allegations are based on publicly available manifest

information that details specific shipments including the factory, the manifest

number and the date of arrival.  FAC ¶ 23, JA 43.

It is arguable whether this manifest information represents a public

disclosure as defined in section § 3730(e)(4)(A) as "a criminal, civil, or

administrative hearing, in a congressional, administrative, or Government

Accounting Office report, hearing, audit, or investigation, or from the news

media."  *See Schindler Elevator Corp. v. United States ex rel. Kirk*, 131 S.Ct. 1885

(2011) (government responses to FOIA requests are reports and are thus public

disclosures).

The question of whether X, the names of the suppliers, which is taken from

publicly available manifest data, is deemed to be a public disclosure under the

FCA does not need to be addressed since Y, the true facts that the claimed

manufacturer did not produce pencils imported by the Defendants, is not public.

The fact that the manifest data reveals the name of the purported manufacturer of

pencils in a country other than China and the importer of those pencils does not

reveal the fraud.  The allegation of fraud, Z, is the false claim that the pencils are

made by a manufacturer located in a country other than China.  That fraud does not

become evident until it is known that that the supplier did not produce pencils claimed by the Defendants to be produced by that supplier.

### 1.    The ITC Reports do not Represent a Public Disclosure

The court accepted the Defendants' argument that the ITC reports, one from 1994 and the other from 2005, represent Y in the equation.  The ITC reports partially describe some of the characteristics of Chinese pencils in comparison with U.S. pencils in 1994.  The ITC reports make no contemporaneous comparison between Chinese-made pencils and pencils made in other countries.  The fact that Defendants' pencils have the Chinese characteristics described the ITC reports does not, alone, disclose that Defendants pencils were made in China.  It is still possible that they could have been made in some low-end factory in a third country. [6]  The ITC reports do not provide the "Y" necessary to the "transaction" which is supplied by the Relator's investigation – the allegation that the pencils were manufactured in China because the Taiwanese, Indonesian and Vietnamese suppliers to the Defendants did not produce the pencils claimed.  In the lexicon of *Springfield*,

> None of the sources relied upon by the defendant reveal an allegation of fraud (the Z result), or any transaction of fraud (the combination of X and Y factors), as they fail to identify any schemes, the existence of both a misrepresented state of facts and a true state of facts, or otherwise suggest an exchange between two parties.  See *Springfield,*

---

[6] Defendant Staples makes this very argument in another context in its reply brief. Staples Reply Br. at 3-4 (Dkt. No. 71), JA 182-183.

14 F.3d at 654 (explaining that "[t]he term 'transaction' suggests an exchange between two parties or things that reciprocally affect or influence one another").

*Digital Healthcare*, 778 F. Supp 2d at 51.

The ITC reports contain only a general comparison of Chinese and U.S. made pencils. In its discussion of the quality of the Chinese pencils, the reports do not identify ***any*** specific importers, much less the Defendants in this action. The reports do not explain where the fraud is occurring, what actors are involved, or the nature of the schemes. See *United States ex rel. Baltazar v. Warden*, 635 F.3d 866, 868 (7th Cir.2011)("[a]s far as we can tell, no court of appeals supports the view that a report documenting widespread false claims, but not attributing them to anyone in particular, blocks qui tam litigation against every member of the entire industry."). See also *Little v. Shell Exploration & Prod. Co*., 690 F.3d 282, 293 (5th Cir. 2012) ("scope and breadth" of publicly disclosed information must correspond to allegations to bar action).

### 2. The ITC Reports' Description of the Characteristics of Chinese Pencils is Incomplete and Based on Dated and Conflicting Opinions of Industry Representatives.

The district court minimized the allegations that the identified factories did not produce the pencils claimed to be produced by those suppliers. Instead, it held that the Y element consists of the allegations claiming that Chinese pencils can be identified by the physical condition of the pencils and argues that those allegations

are "substantially similar" to, and therefore based on, public reports issued by the

ITC.  An analysis and comparison of the purported public disclosure and the FAC

demonstrates the court's errors.  In its brief to the district court, Staples mined

several ITC reports to state the following:

> Regarding Relator's allegation that Chinese pencils often have off-center, low quality leads, ITC reports state:
>
> - Inspected Chinese pencils "had leads that would break easily." ITC Pub. 2816 Certain Cased Pencils from Thailand, Investigation No. 731-TA-670 (Final) at II-49 (Oct. 1994), available at: http://books.google.com/books?id=SMmZAAAAIAAJ;
>
> - They possess inferior "centering of lead." *Id.* at II-54; and
>
> - They "use lower quality graphite." ITC Pub. 3820 Cased Pencils from China,  Investigation No. 731-TA-669 (Second Review) at I-19 (Nov. 2005), available at**:** http://www.usitc.gov/publications /701_731/ pub3820.pdf.
>
> Regarding Relator's allegation that Chinese pencils often have low quality, poorly affixed erasers and ferrules, ITC reports state:
>
> - Chinese pencils "were made from lower quality, less expensive … eraser, ferrules, and cores." ITC Pub. 3820 at I-7; and
>
> - They "did not erase well" and had "loose ferrules and erasers." ITC Pub. 2816 at II-49.
>
> Regarding Relator's allegation that Chinese pencils often have poor quality paint and paint application, ITC reports state:
>
> - Chinese pencils "use . . . no lacquer or use low-end paint." ITC Pub. 3820 at I-19; and

22

- They have inferior "finish [and] paint covering." ITC Pub. 2816 at II-54.

Staples Mem. at 32. (Dkt. No. 56 ), JA 126.

These snippets from the ITC reports do not reflect the character and limitation of the actual reports. For the Court's convenience, the full text of the relevant ITC report language is set out again:

> Five of the 7 responding U.S. producers and 7 of 24 responding importers reported that U.S.- produced pencils are of better quality than Chinese-produced pencils. Two of the responding U.S. producers stated that Chinese pencils use lower quality wood, did not sharpen or erase well, had loose ferrules and erasers, and had leads that would break easily. However, one U.S. producer indicated that the Chinese quality had been improving and that the price differential was more significant than and out weighted the quality differences between the U.S. and Chinese pencils. One U.S. importer that uses Chinese pencils for *** agreed.

ITC Pub. 2816 at II-49, JA 165.

> "17 [importing] firms reported that there were no significant differences in the quality of Chinese pencils . . . vis-a-vis domestic pencils."

ITC Pub. 2816 at II-49, n. 101, JA 165.

> Purchasers were divided on the issue of product comparability between U.S. and imported pencils. While about one half of responding purchasers (i.e. 7 of 16) reported that there were no significant differences between domestic and imported pencils, the remaining purchasers stated that there were. Nine of 15 firms reported that the quality of the domestic product was superior to that of the pencils imported from China and Thailand. Purchasers stated that U.S. pencils have a better finish, paint covering, centering of lead, and attachment of ferrule and eraser.

ITC Pub. 2816 at II-54, JA 166.

> The report for the original investigation indicated that the differences
> in appearance between U.S.-produced and imported cased pencils
> were not sufficiently great for the average retail customer to detect
> them. The imported pencils subject to the investigation, however,
> were made from lower quality, less expensive wood, eraser, ferrules,
> and cores than comparable U.S.-made articles.  In response to
> questionnaires issued during the original investigation, U.S. importers
> generally conceded that the Chinese-produced pencils they imported
> were of lower quality than domestically produced pencils.

ITC Pub. 3820 at I-7, JA 204.

> Low-end pencils in China are made from poplar, use lower quality
> graphite, and use the original color of the wood with no lacquer or use
> low-end paint.

ITC Pub. 3820 at I-19, JA 216.

First, it is important to note that these statements do not represent a finding
of the ITC or its investigative staff.  Instead, all of these statements are derived
from conflicting opinions of the respondents to ITC questionnaires issued to
importers, purchasers and U.S. producers during the course of its original 1994
investigation.  ITC Pub. 2816 at. II-49, JA 165.  These statements do not establish
any facts on which to base "allegations" or "transactions" for an FCA complaint.
Further, these statements only provide a basis for comparing Chinese-made pencils
with U.S. produced pencils.  They do not provide a basis for comparing Chinese
pencils with pencils produced in third countries such as Indonesia, Taiwan and
Vietnam, which is the relevant comparison.

24

The statement in the 2005 ITC report concerning the quality of the erasers and ferrules is from the 1994 ITC report. "The imported pencils subject to the [original] investigation, however, were made from lower quality, less expensive wood, eraser, ferrules, and cores than comparable U.S.-made articles."  ITC Pub. 3820 at I-7, JA 204.  The only statement from the 2005 ITC report that may be at all contemporaneous with the FAC filed in 2008 states "low-end pencils in China are made from poplar, use lower quality graphite, and use the original color of the wood with no lacquer or use low-end paint."  *Id.* at. II-19, JA 216.  However, as pointed out below these factors are either erroneous or not set out in the original complaint as a basis for distinguishing Chinese-made pencils from other third country producers.  Only the reference to the quality of the paint was mentioned in the FAC.

These conflicting opinions dating from 1994 about the quality of Chinese pencils compared with U.S. pencils can hardly be the basis for asserting an element of a false claim in 2008 asserting that pencils claimed to be produced in third countries are of Chinese origin.  A Relator certainly could not rely on such dated and conflicting testimony to prove his case twelve years later, especially when the relevant comparison is wrong.  These opinions demonstrate that, while the quality of the pencils may call into question the origin of the pencils, it does not provide proof that those pencils originated in China.

25

Moreover, the allegations in the FAC regarding the quality of Chinese pencils are far broader and more detailed than that in the ITC Report.  The characteristics are set out in ¶ 20:

> Chinese pencils can be readily identified by their overall appearance and quality that is a result of the unique manufacturing processes used in China.  These different processes show up primarily in the way the pencil sandwiches are bonded together and the color of the wood. These differences and others are described below.
>
> **Pencil Seam:**  Many pencils made in China are unique in that their seams are laid apex to apex whereas the seams on pencils made in the rest of the world are laid flat to flat.  This type of bonding is found only rarely in pencils made outside China.
>
> **Wood color:**  Chinese pencil factories will often use slats of un-dyed, light brown basswood.  Low-end Chinese pencil slats are often treated by being tumbled in steel cylinders over an open wood flame.  This causes the wood to take on a toasted brown color.  Chinese manufacturers also use equally inexpensive air drying, which results in a light, natural color slat and pencil.  Cheap Chinese pencils show no evidence of the more costly chemical emulsion and kiln drying treatment of the basswood slats.  This chemical treatment creates a markedly reddish tint in the pencil's wood casing, usually absent in the low quality pencil of Chinese origin.
>
> **Leads:**  Leads are often off-center in Chinese pencils because low end producers have very low quality standards.  Machinery is of poor quality, and producers keep prices down by not sorting out off-center leads from the final product.  In an effort to hold down costs, the leads are sometimes of a smaller diameter (for example 1.9mm vs 2.1 or 2.2mm).
>
> **Erasers and Ferrules**:  Erasers and ferrules are of the lowest quality and often poorly affixed to the pencil.

> **Lacquering:**  Low-end Chinese pencils usually have poor quality paint and paint application.
>
> **Defects in Round Pencils:** Low-end round Chinese pencils often contain flat spots on their surfaces and are oval in shape instead of round.  The other quality issues apply to round as well as hex pencils.
>
> **Price:**  Low-end Chinese raw pencils sell for between $1.60 and $1.80 per gross exported from China.  Processing them in third countries adds approximately $.60 to $.70 to their cost and sell for a total FOB price of between $3.10 to $3.30.  Pencils produced in those third countries by legitimate manufacturers typically sell for $3.80 to $4.50, creating significant advantage for those importers willing to circumvent Chinese antidumping duties.

FAC ¶ 20. JA 41.

While the 1994 references to the erasers and ferrules and the "centering of the lead" are similar to the allegation in the FAC, the balance is completely different.  This limited and dated correspondence of facts to the allegations in the FAC is simply not sufficient to satisfy the public disclosure bar.

There is no discussion in the ITC reports regarding the bonding of the pencils, the easiest and most certain way to identify low-end Chinese pencils. This factor alone makes the allegations in the FAC substantially different rather than substantially similar to the discussion in the ITC reports.  Further, the quoted language in the ITC reports states that Chinese pencils are made "from poplar . . . and use the original color of the wood," while the FAC states that Chinese pencils are made from basswood and often use a manufacturing technique that "causes the

wood to take on a toasted brown color."  At the same time the FAC does not claim

that the leads "use a lower quality graphite," or "had leads that would break

easily."   The quoted language from the ITC report does not discuss round pencils.

Finally, and perhaps most importantly, the ITC reports do not provide public cost

information[7] regarding the differential between transshipped Chinese pencils and

pencils produced Indonesia, Taiwan and Vietnam by legitimate manufacturers.

Thus, it is impossible to conclude that Relator's allegations are based on the ITC

reports.

Even if the Court determined that the allegations regarding the physical

differences between Chinese and third-country pencils represented Y in the

*Springfield Terminal* equation, the limited statements in the ITC report could not

form the basis of a public disclosure, because simply indicating that Chinese

pencils are of a lower quality does not exclude the possibility that they originate in

the countries claimed by the Defendants.   It is noteworthy that while the 2005 ITC

report states that "cased pencils produced in the United States are sold to retailers

[including] Staples and Target [and p]encils imported from China during the

original investigation reached the market through the same channels of

distribution,"  it does not suggest that these pencils are transshipped through third

---

[7] The ITC treats most cost information as confidential.  Confidential information is
redacted from the public versions of its reports and is replaced with "***."
Therefore, it would be highly unlikely to find a public disclosure of cost
information in the ITC reports.

countries.  *See* ITC Pub. 3820 at I-7, JA 204.  Therefore, the ITC report does not represent a public disclosure of the allegations in the FAC.

The district court mistakenly asserts "according to the relator, the alleged fraud would have been ascertainable by any person who read the ITC reports and looked at the pencils on the defendants' shelves."  Slip op at 10, JA 193.  The Relator did not make the claim that the characteristics of the pencils proved that they were of Chinese origin.  He argued that given the circumstances: (1) the 114.9 percent antidumping duty; (2) the low price of the pencils; and (3) the characteristics of the pencils, the Defendants should have made a diligent inquiry into the origin of their pencil imports.   Knowledge under the FCA can be proven by a demonstration of deliberate ignorance or reckless disregard of the facts with no requirement to show specific intent.  31 U.S.C. § 3730(b).   The allegations regarding physical appearance were inserted to demonstrate that the Defendants were on notice that the pencils they were purchasing in third countries were likely of Chinese origin and that they had the duty to investigate to determine the true origin.  *See* FCA ¶¶ 19, 21, JA 41, 43.  Therefore, the Defendants' failure to investigate the origin of their pencils given their physical condition and price is a demonstration of knowledge under the FCA.

### 3.     There has been no "Public Disclosure" of the Characteristics of Defendants' Pencils.

The ITC Reports do not disclose that pencils bearing the characteristics described in the FAC appear on the Defendants' retail shelves.  Without a reference to the physical pencils in the reports there can be no public disclosure.  However, the district court dealt with this omission by finding that "the characteristics of defendant's pencils are also publicly disclosed through print media, the internet, and their visibility on public store shelves."  Slip op at 9, JA 192.

While these shelves may be open to the public, they are not a "public disclosure of allegations or transactions" that deprives the courts of jurisdiction in FCA cases. As explained by the Court in *Graham County*:

> [T]he FCA's public disclosure bar [] deprives courts of jurisdiction over *qui tam* suits when the relevant information has already entered the public domain through certain channels.  The statute contains three categories of jurisdiction-stripping disclosures.  [These are] the public disclosure of allegations or transactions [1] in a criminal, civil, or administrative hearing, [2] in a congressional, administrative, or Government Accounting Office [(GAO)] report, hearing, audit, or investigation, or [3] from the news media. . . .

*Graham County*, 559 U.S. at 265-86, *citing* § 3730(e)(4)(A).

Therefore, since "public store shelves" are not "channels" or "categories of jurisdiction-striping disclosures" contained in the statute, they do not act as a public disclosure.  In order for the "allegation" to be publicly disclosed under the

30

statute the disclosure must identify the pencils that are of Chinese origin. Thus, at most, the information that is publicly disclosed contains only half of the allegation that "the pencils on Defendants shelves have the characteristics of Chinese pencils." The fact that Chinese looking pencils are publicly available does not mean they are publicly disclosed under the statute.

The district court further found that the characteristics of the subject pencils "are also publicly disclosed through print media, the internet." Slip op. at 9, JA 192. The court was referring and exhibit of Staples advertisements. Staples' exhibits, Dkt. No. 56-1, 56-2, JA 135, 141. The court's error is that the pictures of the Defendant Staples' pencils do not reveal anything about their characteristics. They do not reveal the bonding, provide a clear indication of color of the wood, the quality of the erasers and ferrules or any of the other indicia described in the FAC or the ITC reports to suggest that they are of Chinese origin.[8] To the contrary, the pictures in Defendant Staples' exhibit suggest that they are of good quality; the leads are centered and the finish is uniform. Nothing in these pictures would support an allegation that these pencils are of Chinese origin.

Further, the pictures do not reveal any markings of the claimed country of origin of the pencils. It is impossible to determine from the pictures that the

---

[8] OfficeMax made a similar argument, but failed to provide a copy of its promotional material or explain exactly which "Chinese" characteristics could be gleaned from that material.

31

defendants made a false claim of origin regarding these pencils and whether they relate to the shipments identified in the FAC.

### B.    The Relator Qualifies as an Original Source of the Information Regarding the Characteristics of Chinese-Made Pencils.

The Relator had the firm conviction that the district court would not find that the information regarding the quality of Chinese made pencils contained in the ITC reports to represent a public disclosure that barred the court's jurisdiction.  For this reason, he did not attempt to make a serious argument that he was an original source.  However, he did ask the district court for an opportunity to present such an argument if the court determined that the ITC reports represented a public disclosure.  Plaintiff's  Opp. To OfficeMax Mot to Dismiss at 17.  Dkt. No. 46, JA 67.  The court did not directly address this request, but instead, reviewing the record before it and found that the Relator did not qualify as an original source. Slip op. at 10-12, JA 193-195.

This Circuit recently adopted the rule that an original source need only have "[1] direct and independent knowledge of the information on which the allegations are based and [2 have] voluntarily provided the information to the Government before filing an action under this section which is based on the information." *Davis,* 678 F. 3d at 836-40**.**  *Davis* reversed *Findley*, which required the original source to have also provided the information to the government prior to the publication of the publicly disclosed information. *Id.*

32

Under the standard set out in *Davis,* the Relator qualifies as an original source of the information regarding the quality of Chinese pencils.  The information contained in the record demonstrates that the Relator had direct and independent knowledge of the information on which his allegations of the quality of Chinese pencils is based, and that he provided that information to the government before his FAC was filed.

The rationale for the district court's decision that he was not an original source was that the Relator gained his knowledge from "industry insiders, analyzing trade data, and "hiring investigators in Taiwan, Indonesia and Vietnam to investigate individual suppliers who were identified by sources within the industry.'"  Slip op. at 11, JA 194.  The court's error was twofold.  First, the information obtained from these sources was not publicly disclosed, i.e., that the suppliers were not capable of or did not make the subject pencils.  Therefore, the original source issue does not arise from this information.  Second, the information gained from these sources had nothing to do with the quality of Chinese pencils.

The Relator is an industry insider and is an original source for information regarding the quality of the pencils.  The detail contained in the FAC at paragraph 20 regarding the characteristics of Chinese pencils is far more extensive than and different from that contained in the ITC reports.  This alone demonstrates that the Relator has direct and independent knowledge of the characteristics of Chinese

pencils.  This "information" is "'the information on which the *relator's allegations*

are based [, not] the information on which the *publicly disclosed allegations* that

triggered the public-disclosure bar are based.'"  *Davis*, 678 F.3d at 838 (*citing*

*Rockwell International Corp. v. United States,* 549 U.S. 457, 470 (2007)).   As

noted by *Davis,* "the relator's information can be different and more valuable to the

government than the information underlying the public disclosure, which might be

nothing more than speculation or rumors."  *Id.* (*citing Rockwell*, 549 U.S. at 472).

This consideration is particularly appropriate here, since the information in the ITC

reports was based on the conflicting opinions of questionnaire respondents and,

therefore, is unreliable.  Relator's extensive description of Chinese pencils,

together with the information gained from his investigation, is both different and

far more valuable than the limited description of Chinese pencils contained in the

ITC reports.  Since this information was provided to the government before the

filing of his original complaint, there is no basis to deny the Relator "original

source" status.

## CONCLUSION

For the foregoing reasons, Relator requests that the district court's dismissal

of the FAC be reversed, and this case be remanded for proceedings on the merits of

his claims under the False Claims Act.  If this Court determines that the allegations

or transactions of fraud were publicly disclosed and the existing record does not

demonstrate that Relator is an original source of the information on which the FCA

is based, he requests that this matter be remanded to permit him a full opportunity

to establish that he is an original source.

Respectfully submitted,

*/s/ Joseph A. Black*
Joseph A. Black (D.C. Bar 414869)
Joyce E. Mayers (D.C. Bar 268227)
James A. Moody (D.C. Bar 294594)
        Of Counsel
The Cullen Law Firm, PLLC
1101 30th Street NW, Suite 300
Washington, DC 20007
(202) 944-8600

September 12, 2013                    Counsel for Appellant

35

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(C) and Cir. R. 32 (1) in that the brief contains **8, 519** words excluding those parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of September, 2013, an electronic copy of Appellant's Principal Brief and the Joint Appendix, was served via CM/ECF system to all parties of record.  In addition, one copy of the Appellant's Principal Brief and the Joint Appendix will be mailed via Federal Express upon the individuals listed below:

John F. Henault, Jr.
Steve Y. Koh
Paul Graves
Perkins Coie LLP
700 Thirteenth Street, N.W.
Washington, D.C. 20005-3960
*Counsel for OfficeMax, Incorporated*

James L. Volling
Mathew B. Kilby
Faegre Baker Daniels LLP
2200 South Seventh Street
Minneapolis, MN 55402-3901
*Counsel for Target Corp.*

Leslie Paul Machado
Robert P. Fletcher
LECLAIR RYAN
1101 Connecticut Ave, NW Suite 600
Washington, DC 20036
*Counsel for Industries for the Blind, Inc.*

John M. Peterson
Maria E. Celis
Richard F. O'Neill
NEVILLE PETERSON, LLP
17 State Street, Suite 1900
New York, NY 10004
*Counsel for Target Corp.*

David William Ogden
Don Bradford Hardin , Jr.
WILMER CUTLER PICKERING
HALE & DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
*Counsel for Staples, Inc.*

Darrell C. Valdez
U.S. ATTORNEY'S OFFICE
Judiciary Center Building
555 Fourth Street, NW
Washington, DC 20530
*Counsel for the United States*

*/s/ Joseph A. Black*
Joseph A. Black